```
 1                      UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
 2
                         CASE NO. 19-CR-20085-MGC
 3
     UNITED STATES OF AMERICA,
 4                                        Miami, Florida
                     Plaintiff(s),
 5                                        January 22, 2020
             vs.
 6
     GEORGE FERRER SANCHEZ,
 7
                     Defendant(s).       Pages 1 - 38
 8   ------------------------------------------------------------

 9                         SENTENCING HEARING
                   BEFORE THE HONORABLE MARCIA G. COOKE
10                    UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   FOR THE GOVERNMENT:      IGNACIO JESUS VAZQUEZ, JR.
                              ANNIKA MIRANDA
13                            United States Attorney's Office
                              99 NE 4th Street
14                            Miami, FL 33132
                              ignacio.vazquez@usdoj.gov
15                            annika.miranda@usdoj.gov

16
     FOR THE DEFENDANT(S):    PHILIP HOROWITZ
17                            9130 South Dadeland Boulevard
                              Suite 1910 - Two Datran Center
18                            Miami, FL 33156
                              HorowitzDefense@aol.com
19

20   REPORTED BY:            Jill M. Wells, RPR, CRR, CSR
                             Official Court Reporter
21                           400 N. Miami Avenue, Suite 08S27
                             Miami, Florida 33128
22                           jill_wells@flsd.uscourts.gov

23

24

25
```

1    (Case called to order of the court at 1:50 p.m.)

2              THE COURT:  Calling United States v. George Ferrer

3    Sanchez.

4              For the record, appearing on behalf of the United

5    States.

6              MR. VASQUEZ:  Good afternoon, Your Honor.  Ignacio

7    Vazquez and Ms. Miranda, appearing on behalf of the United

8    States.

9              THE COURT:  Appearing on behalf of Mr. Ferrer Sanchez.

10             MR. HOROWITZ:  Phil Horowitz, on behalf of George

11   Ferrer Sanchez, who is present before the court.

12             THE COURT:  Spectators and probation may be seated.

13             Counsel, and I don't know where I should be here in my

14   discussions with the probation officer.

15             I understand, Mr. Horowitz, that you have substantial

16   objections to the probation report, and because of that counsel

17   for the United States has filed an exhibit list with

18   approximately seven or eight witnesses last night.

19             Now, I am not prepared today based upon the time that

20   was allocated for this case.

21             MR. HOROWITZ:  Sorry to interrupt, but we are having

22   issues with the translation.

23             THE COURT:  Hold on.  Sorry to interrupt.

24             Sir, can you hear me?

25             THE DEFENDANT:  Yes.

1          THE COURT:  So is this a legal issue that can be

2     resolved, and if not -- I mean, we may go through some of them

3     today, but if Mr. Vazquez believes that it's necessary to call

4     these witnesses, we will be unable to finish this hearing

5     today.

6          So I am going to go to you, Mr. Horowitz, first

7     because Mr. Vazquez says, Judge, I am prepared to call all of

8     these witnesses because of the objections that the defense has

9     filed.

10         MR. HOROWITZ:  Your Honor, to give a lawyer answer,

11    maybe.  The reason why I say maybe is if the court decides that

12    the alien smuggling guidelines are the applicable guidelines

13    for this case, then I believe the government will go forward

14    with all of their witnesses.

15         I think there is even a witness here today that is not

16    even on their list.  They have four in-custody witnesses that

17    the government was going to call plus numerous exhibits.

18         THE COURT:  Now, Mr. Horowitz, I believe, and the

19    probation officer is here, we have had substantial

20    conversations about the calculations in this case.  This case

21    was pled as a money laundering case, correct?

22         MR. HOROWITZ:  Correct, your Honor.  If the court

23    decides that the money laundering guidelines are the applicable

24    guidelines, then there would be two issues.

25         Issue number one would be whether the case involves

1  sophisticated laundering.

2         Issue number two would be as it pertains to the money

3  laundering case and the money laundering case alone, whether

4  Mr. Ferrer Sanchez had an organizational role increase.

5         Those would be the only two issues if the court

6  decides that the money laundering guidelines are the applicable

7  guidelines.

8         THE COURT:  So, Mr. Horowitz, since you are already

9  standing, and I think that it is your position that it is the

10  money laundering guidelines, not the alien smuggling guidelines

11  that apply, I would like to hear your argument.

12         I think, maybe I am wrong, that the probation officer

13  agrees with Mr. Horowitz on this, that it's the money

14  laundering guidelines, correct?

15         THE PROBATION OFFICER:  Correct, your Honor.

16         THE COURT:  Let's start with Mr. Horowitz, then I will

17  hear from Mr. Vazquez on this issue because that will allow us

18  to determine what else we need to do this afternoon.

19         Mr. Horowitz.

20         MR. HOROWITZ:  Yes, your Honor.  Your Honor, I had

21  placed into issue that I think it's the alien smuggling

22  guidelines that apply, and I think the alien smuggling

23  guidelines are lower; however, probation disagrees with my

24  position.  And if the money laundering --

25         THE COURT:  Basically, if I am understanding what

1   counsel for the United States is saying, that the money

2   laundering conspiracy is a result of the alien smuggling.

3          Am I understanding that correct, Mr. Vazquez?

4          MR. VAZQUEZ:  Yes, it is the vehicle through which

5   alien smuggling proceeds were realized.

6          THE COURT:  It's almost -- and this is where I think

7   intellectually the government and the probation officer

8   disagrees -- the probation officer's position is there is one

9   path, that you can't mix the two guidelines particularly for

10  purposes of the monetary calculation.

11         Am I correct?

12         THE PROBATION OFFICER:  Your Honor, I chose the money

13  laundering guideline, and as we discussed prior to sentencing,

14  because in application note (3)(A) of United States Sentencing

15  Guidelines 2S1.1, Subsection (a)(2), which is the money

16  laundering guideline, it applies to --

17         THE COURT:  2S1.1?

18         THE PROBATION OFFICER:  Yes, application note (3)(A)

19  in the commentary.

20         THE COURT:  2S1.1 application note (3)(A), okay.

21         THE PROBATION OFFICER:  So there it states, in

22  general, Subsection (a)(2) applies to any case in which the

23  defendant did not commit the underlying offense, or the

24  defendant committed the underlying offense and would be held

25  accountable for the underlying offense under -- and it cites

1    another guideline there which is 1B1.3(a)(1)(A), which is

2    relevant conduct, but the offense level for the underlying

3    offense is impossible or impractical to determine.

4         And based off of the information I received from the

5    government I felt it was impractical to determine the total

6    offense level using the human smuggling guideline.  So that's

7    how I arrived at using the --

8         THE COURT:  When I look at your second addendum and

9    the information provided by the United States, is that the

10   issue that you are saying makes it difficult to determine that

11   guideline?

12        THE PROBATION OFFICER:  Correct, your Honor, but in

13   order to use the human smuggling guideline I need specific

14   facts about the amount of immigrants that were smuggled, all

15   the relevant information pertaining to the specific offense

16   characteristics.

17        You use that entire guideline to make your total

18   offense level, and I feel like I am missing far too many facts

19   to make -- to have sound judgment on what the appropriate

20   offense level is using that guideline, the human smuggling

21   guideline.

22        THE COURT:  Mr. Horowitz?

23        MR. HOROWITZ:  Judge, in my objections, specifically

24   toward the end, the difference between the money laundering

25   guidelines and the alien smuggling guidelines is that the alien

1   smuggling guidelines have nine specific offense characteristics

2   that need to be determined to see whether the defendant would

3   qualify for certain things including a number of aliens,

4   reckless endangerment during flight, and things of that nature.

5          The offense conduct portion of the PSI, as

6   Mr. Fernandez stated, has absolutely nothing in there, and it

7   would have to be a line-by-line determination because based on

8   what's on the PSI, based on what's in the factual proffer

9   agreed by the defendant at sentencing there is nothing there.

10         So it's our position that if the alien smuggling

11  guidelines, which is the underlying conduct that Mr. Ferrer

12  Sanchez pled guilty to, I laid out what I think the guidelines

13  would be, and I think it's on page 15 of my submission.

14         THE COURT:  But I think the issue is absent the

15  proffer that Mr. Vazquez made in his filings.

16         MR. HOROWITZ:  It's a straight money laundering case.

17         THE COURT:  The probation officer is saying that's not

18  in any of the things I looked at, that's not in any of the

19  documents I had, and that these were provided via other witness

20  statements not made available to me.

21         Mr. Vazquez is saying, well, Judge, I can remedy that,

22  I have got eight witnesses in the back I can bring out now, and

23  we can basically have a hearing on this.

24         But my issue is I have a factual proffer that this

25  defendant signed that states what is the behavior in this case,

1    and it is a factual -- it's not, like, small.  It's like a

2    five-page factual proffer.

3         Now, the factual proffer does discuss migrants, but

4    it's basically that the vehicle for the smuggling is not the

5    issue that he was charged with.  He's charged with laundering

6    the proceeds from the smuggling.  I think Mr. Vazquez wants me

7    to use both, money laundering and alien smuggling, and I think

8    I have to choose.

9         MR. VAZQUEZ:  Your Honor, may I?

10        THE COURT:  Yes.

11        MR. VAZQUEZ:  The government has provided our

12   discovery.  It was provided to Mr. Horowitz with regard to all

13   the witness statements and accounts.  That is from my

14   discussions, respectfully, with the probation officer.

15        It was, I think, deemed insufficient because that's

16   what a witness said, and what a witness said in the view of the

17   probation officer wasn't sufficient such as, I guess, what we

18   would need to have an intercepted criminal migrant vessel

19   captured to count the number of migrants that are at sea.

20        The government believes that the guidelines are

21   readily identifiable, but they are in dispute.  The proffer

22   that the court has is what Mr. Horowitz and his client have

23   agreed to because from my understanding Mr. Ferrer Sanchez,

24   like he stated in his post-Miranda interview, smuggling is his

25   thing.  There is no dispute that he is smuggling.

1          THE COURT:  But that's not what he pled to.

2          MR. VAZQUEZ:  He pled to money laundering.

3          THE COURT:  Right.

4          MR. VAZQUEZ:  Money laundering of alien smuggling

5    proceeds.

6          THE COURT:  But you want me to now use that vehicle?

7    If I am looking at it, you want me to bring in a host of other

8    things to discuss.

9          MR. VAZQUEZ:  Yes, because that is what the money

10   laundering guideline, I think what the probation officer just

11   stated to the court, calls for, that if the underlying offense

12   can be identified, then you apply that.  That's a principle of

13   cross reference that is employed in our sentencing proceedings.

14   That is what is --

15         THE COURT:  So do you disagree with the calculation

16   contained in the PSR?

17         MR. VAZQUEZ:  Yes.  We filed our own objections in

18   October of 2019.  There were continuances so that Mr. Horowitz

19   could prepare his response to the probation office.  We

20   encouraged that, but we filed our objections.  The probation

21   office filed its addendum reflecting its position in opposition

22   to our objections, as-is their right, and we are ready to

23   present the cases in accord with your Honor's rulings.

24         I think that the discrepancy here between the

25   probation office and I believe both parties here is that the

1  guideline can be identified.  We believe that it is proper for

2  the court, and we respectfully disagree with the probation

3  officer that he could have relied upon witness accounts to

4  determine it's more than 100 aliens because our witnesses, I

5  would proffer to the court, in advance of any proceedings would

6  testify that someone who's been smuggling aliens since 2009 is

7  going to smuggle, as a commercial enterprise, is going to

8  smuggle more than 100, and our witnesses will testify to that

9  fact.  Someone who has laundered millions of dollars at $10,000

10 an alien mathematically smuggles more than 100 aliens.  So it's

11 just a question of math.

12        THE COURT:  A question of your math, but I think what

13 the probation officer is saying is you have extrapolated that,

14 but -- the probation officer can correct me if I am

15 misunderstanding -- there is nothing that he reviewed that says

16 that's the number.

17        Am I correct to the probation officer?  Because I

18 don't want to misstate this.

19        THE PROBATION OFFICER:  You are correct, your Honor.

20 Both the government and defense counsel, they want to use

21 2S1.1, but I believe there is a difference on how it is to be

22 applied specifically with the amount of migrants smuggled and

23 also with all the specific offense characteristics that are

24 applicable to this defendant.

25        THE COURT:  To the probation officer, am I still to

1  look at 2S1.1, and note (3)(A) applies to any case in which the

2  defendant did not commit the underlying offense or the

3  defendant committed the underlying offense or would be

4  accountable for the underlying offense under 1B1.3(a)(1)(A).

5         THE PROBATION OFFICER:  Your Honor, I had also pointed

6  to "but the offense level for the underlying offense is

7  impossible or impractical to determine."

8         I think this is an example of where it's impractical

9  to determine the total offense level using the 2S1.1 guideline

10 because there is no agreement -- at least that's my

11 understanding -- that there is no agreement on the amount of

12 migrants that were smuggled and the SOCs that are applied to

13 those instances in which the migrants were smuggled.

14        So that's the trouble I am running into, and that is

15 my interpretation of the proper application of 2S1.1(a)(2).

16        THE COURT:  Mr. Horowitz, you agree with probation or

17 you disagree with probation?

18        MR. HOROWITZ:  Judge, I agree with probation because

19 if we have to go through those nine factors, I think it would

20 be impractical to determine based upon cooperating witness

21 testimony, the evidence that I am aware of as far as number of

22 aliens, reckless endangerment, and things of that nature I

23 think it would be impractical.

24        As far as the money laundering guidelines, it would

25 leave us with two issues.  Issue number one being whether the

1   case involved sophisticated laundering or not, and secondly,

2   whether Mr. Ferrer Sanchez, as it pertains to money laundering,

3   would otherwise get a four-level increase for organizer or

4   leader as far as that is concerned.

5        THE COURT:  For the record, I agree with probation,

6   that the guideline note to 2S1.1 (3)(A) in general is

7   applicable, and I specifically find given the information that

8   I have contained in the objections as well as the probation

9   officer's report leads me to think that the offense level for

10  the underlying offense is impossible or impractical to

11  determine.  So that guideline issue remains.

12       So that now leaves Mr. Horowitz to, if I am looking at

13  it correctly -- I want to go to the calculation page again.  So

14  the base offense level at 24 -- at Paragraph 24, excuse me,

15  would remain the same and be a level 26.  At Paragraph 25 the

16  special offense characteristics would remain a level 2.

17       Do you agree with that, Mr. Horowitz?

18       MR. HOROWITZ:  Unfortunately, yes, Judge.  I know it

19  applies to all money laundering cases.  Under 1956 you get a

20  two-level increase, and this is one of those cases.

21       THE COURT:  So given my ruling the only disagreement

22  you have -- I know the government disagrees with my ruling --

23  is at Paragraph 28, that because the defendant was a leader or

24  organizer and the criminal activity involved five or more

25  participants the offense level is increased by four.  Is that

1   the other one you disagree with?

2           MR. HOROWITZ:  Judge, I disagree with Paragraph 26

3   which states that the offense involved sophisticated laundering

4   and therefore it's a two-level increase, as well as

5   Paragraph 28, which is the --

6           THE COURT:  So would you give me your reasons for

7   Paragraph 26?

8           MR. HOROWITZ:  Judge, if I may just try to locate my

9   objections.

10          Judge, they are contained, I believe, at page 12 of my

11  objections, but since we are not using the alien smuggling

12  guidelines the first portion of that would be inapplicable.

13          The sophisticated laundering means -- the definition

14  of sophisticated laundering, which is contained in the

15  comments, means -- it typically involves the use of fictitious

16  entities, shell corporation, two or more levels of layering of

17  transactions, and offshore financial accounts.  We really don't

18  have that.

19          Your Honor, what the case involves, and specifically

20  Migrant 1 and Migrant 2 as listed within the factual proffer,

21  Migrant 1 and Migrant 2 are a professional baseball player as

22  well as a baseball player's brother.

23          In exchange for services provided to those two

24  individuals and hopefully getting them into the United States

25  and signing a professional baseball contract, that's where the

 1   $5.4 million comes from.

 2          The deal was that Mr. Ferrer Sanchez would receive, as

 3   well as people that were associated with the ball player, would

 4   receive 20 percent of the contract.

 5          THE COURT:  But, counsel, I am looking at Paragraph 14

 6   where there had to be an establishment of a shell corporation

 7   to receive funds.

 8          All of this stuff had to be set up.  This wasn't

 9   merely like I take money from one bank account and put in

10   another.  People had to do very specific things:  Sign

11   contracts, go to special countries.  I am looking at

12   specifically Paragraph 14 and Paragraph 15 that talks about how

13   this scheme was perpetuated.

14          MR. HOROWITZ:  Judge, there were checks written to --

15   the name of the company was Toca, T-O-C-A, Sports, Gigante,

16   G-I-G-A-N-T-E, for, supposedly, management services, and

17   Mr. Toca was a former professional baseball player in Cuba who

18   assisted in training and hopefully getting this ballplayer to

19   the United States.

20          Those checks the government has provided in discovery

21   were made payable to Mr. Toca and his company.  From those

22   proceeds they were given to Mr. Ferrer Sanchez, and those are

23   the checks that are listed within the PSI.

24          THE COURT:  So do you disagree in Paragraph 14 where

25   it says, "Ferrer Sanchez instructed Toca to establish a Florida

1    shell corporation," do you disagree with that?

2              MR. HOROWITZ:  Judge, I disagree with that.  Mr. Toca

3    had an existing corporation.

4              THE COURT:  Do you disagree that the money was to be

5    deposited into the El Gigante Toca Sports Group?

6              MR. HOROWITZ:  No.

7              THE COURT:  Do you disagree that he was instructed to

8    buy the two work trucks in order to smuggle the migrants?

9              MR. HOROWITZ:  Judge, I think the two work trucks were

10   used for a company that Mr. Ferrer Sanchez had, and that was

11   purchased for his company.  However, I believe that those

12   trucks were purchased with proceeds from the monies that were

13   paid.

14             THE COURT:  In other words, this wasn't merely migrant

15   giving smuggler money, and money being deposited.  So there

16   were things that a person had to be knowledgeable about in

17   order to bring about this scheme?

18             MR. HOROWITZ:  Yes, your Honor.  It had to be what

19   the -- the migrants ultimately tried to be smuggled into the

20   United States, tried to be smuggled into the Dominican

21   Republic, ultimately into Haiti, and then brought into --

22   somehow brought into the United States where one of the

23   migrants signed a major league baseball contract.

24             THE COURT:  And you are saying this was not a

25   sophisticated laundering?

1        MR. HOROWITZ:  As far as the money is concerned, no,

2   your Honor, because the money was paid directly to Toca Sports,

3   as the court noted, and then was disbursed to Mr. Ferrer

4   Sanchez.

5        THE COURT:  Mr. Vazquez.

6        MR. VAZQUEZ:  Throughout the life of this scheme there

7   had been many iterations.  The first iteration of it was the

8   payment from migrants which went from the migrant to associates

9   of Mr. Sanchez who would place it in businesses in South

10   Florida who would then literally, at times, put money in rice

11   cookers that were then shipped to him.

12        Then when Mr. Sanchez continued to evolve as a money

13   launderer he started interacting with businesses who would

14   receive his funds.  Those funds would then be extracted from

15   those businesses in checks -- that we have provided to defense

16   counsel -- to a myriad of associates, one of who is in court,

17   and they would cash those checks and give the money to him.

18        They would then reinvest in work trucks and other

19   property so that --

20        THE COURT:  And those are the checks that are outlined

21   in Paragraph 13 in the PSR?

22        MR. VAZQUEZ:  Yes, your Honor.  This was a

23   multi-layered effort that is outlined in both the factual

24   proffer and the PSR to prevent what Mr. Sanchez told agents to

25   their face when he was arrested "you will not trace a single

 1   penny to me" because he knew what he was doing.

 2          Mr. Sanchez aligned all of these efforts to occur with

 3   over five people.  He is the orchestrator of this complex money

 4   laundering conspiracy that operated for years.

 5          THE COURT:  I agree that Paragraph 26 applies in this

 6   case, that the defendant used sophisticated means in order to

 7   launder the money in this matter to prevent, obviously, law

 8   enforcement to be easily able to trace the money from his

 9   scheme back to him.

10          This was not a simple I cash checks, I get money, and

11   I go about my business.  If you look at the number of checks

12   that had to be negotiated in order to cover this scheme, they

13   are A through O in the PSR.

14          If you look at the issue of how companies had to be

15   created and uncreated and the money had to pass by, this was

16   not a simple I bring migrant or alien, alien comes into the

17   United States.  They had to pass through multiple countries

18   with agreements by and between multiple parties with the

19   assistance of this defendant and others in the conspiracy.

20          So I agree that that portion of the PSR is correctly

21   pointed.

22          So can we now move to Paragraph 28, Mr. Horowitz.

23          MR. HOROWITZ:  Yes, your Honor.  Your Honor, it is the

24   position of the defendant that he did not, as the government

25   puts it, orchestrate all of this.

1    Mr. Ferrer Sanchez was a part of this, not

2 orchestrating it.  He did not lead this venture.  He did not --

3 ultimately, it was Mr. Toca that led the venture together with

4 other unindicted co-conspirators who actually whisked the two

5 migrants that are talked about in the factual proffer to

6 Mexico.

7    Once they got to Mexico, Mr. Ferrer Sanchez had a part

8 in this.  However, the monies Mr. Ferrer Sanchez was not

9 entitled to a larger share as someone who was in charge would

10 be.

11    Did people cash checks or bring -- make deposits?  The

12 answer is yes, your Honor, but primarily the money in this case

13 is easily traceable through the TD Bank accounts as listed

14 above in Paragraph 13, Subsections A through O.  They did go to

15 Mr. Ferrer Sanchez, but he did not orchestrate or lead the

16 money laundering.

17    The money originally went to Toca Sports, for brevity

18 sake, and was disbursed to Mr. Sanchez from there, and not all

19 of it but his portion.  The fact that he received a portion and

20 not the lion's share of the money in this case shows that he

21 was not the organizer or leader of this.

22    THE COURT:  Counsel for the United States.

23    MR. VAZQUEZ:  The record in the factual proffer and

24 the PSI shows that Mr. Sanchez is the lone, unifying force

25 between two distinct money laundering ventures; one, what was

more base-level money laundering of numerous migrants that he

oversaw their smuggling having their payments put into

businesses and then transferred to him, and then he evolved

this scheme with numerous associates into the deposit of funds

into Toca Sports and then extracted by a number of people

throughout South Florida so that he could get it.  He was the

lone, unifying factor in different moments of this conspiracy.

He is the only person that the money shows was profiting from

this.

     The evidence shows, and I would call Special Agent

Battista to explain this, the only person who profited off of

this enterprise that the United States has been able to

identify in any significant fashion with regard to money pumped

through Toca.  Him and his chief associate in the conspiracy,

Mr. Valdevia, who is pending sentencing, got a small share, but

the hundreds of thousands of dollars, the checks that we have

for $400,000, that's for Mr. Sanchez.

     That's how you know, when our forfeiture counsel comes

forward, where houses are, where real estate are.  All of these

matters, that's Mr. Sanchez because he is the one who is the

lone entity that we can actually identify money.  We can

actually see it coalescing around his associates.  He is the

leader, organizer, and orchestrator of this entire scheme, your

Honor.

     MR. HOROWITZ:  The government has alleged that

1    $5.4 million went through, which is the 20 percent of the

2    $27 million contract that the ballplayer signed.

3            The government has $400,000 going to Mr. Ferrer

4    Sanchez, which is a far cry -- don't get me wrong, your Honor,

5    it's a lot of money.  It's not 5.4 million, but that's the

6    conspiratorial amount.  The fact that Mr. Ferrer Sanchez

7    received 400,000 out of 5.4 million amounts to less than

8    10 percent of the money.  Therefore, the government can trace

9    the rest of the proceeds.  They can trace the $400,000 that

10   Mr. Sanchez received.

11           I have the checks.  The government has provided them

12   in discovery.  They have listed some of them in the indictment.

13   They have listed some of them in the factual proffer, and we

14   don't dispute a single check, but that doesn't make him the

15   organizer, leader, manager, or supervisor of the money

16   laundering conspiracy.

17           THE COURT:  I agree with the United States, and I

18   think based upon the information provided by the Pretrial

19   Services officer and as outlined as the facts in this case the

20   defendant was the leader/organizer.  Just because he didn't get

21   all the money doesn't mean he's not the organizer.

22           Everything comes back to him.  Everything sifts

23   through him.  People are acting at his direction or through

24   others at his direction, and that is what makes him the leader

25   and organizer.  And reviewing the facts in the PSR it's way

1   more than five people, way more than five people.

2          The government's met its burden as to Paragraph 28.

3          Any other objections as to the computations of the

4   guidelines?

5          MR. HOROWITZ:  As to the computations, in light of the

6   court's rulings, no further objections.

7          THE COURT:  Subject to my previous ruling,

8   Mr. Vazquez, do you have any other objections to the

9   computation as contained in the guideline report?

10         MR. VAZQUEZ:  Your Honor, we have -- we stand by our

11  objection before.  We respectfully understand the court's

12  position.  I do not have anything further.

13         I would just take this opportunity, to the extent that

14  the court is amenable, I do have witnesses that I have listed

15  that I would seek to present to the court, either today or at

16  another time, for 3553(a) factors.

17         Now, I understand the court's ruling with regard to

18  the alien smuggling, but I think at this juncture --

19         THE COURT:  I am going to hear the 3553(a) factors

20  first, Mr. Vazquez -- I don't know what they all are -- that

21  Mr. Horowitz seeks to present, but at the present time I think

22  I have all the information.  But I will hear from Mr. Horowitz,

23  and then I will hear from you.

24         Mr. Horowitz.

25         MR. HOROWITZ:  Yes, your Honor.  Based on the court's

1    rulings my understanding is that we are at a Level 31, Criminal

2    History Category I.

3              THE COURT:  And that means it's an advisory guideline

4    range of 108 to 135 months.

5              Now, if we had accepted the government's request, it

6    would have been a little different.  The guideline range would

7    have been 40 with a maximum of 240 months based upon the

8    statute.

9              MR. HOROWITZ:  Yes, your Honor.

10             Your Honor, one thing I would ask for on behalf of

11   Mr. Ferrer Sanchez, I am not going to ask for a great variance,

12   I am asking for a slight variance on his behalf.

13             One thing that has kind of gotten forgotten in the

14   midst of this litigation is that Mr. Ferrer Sanchez has

15   accepted responsibility for his actions in this case.  He stood

16   before this court, raised his right hand under oath, and

17   accepted responsibility.  He has met with the government on two

18   occasions, and we hope to continue the dialogue that we had

19   with the government.  We have had productive meetings.  We

20   think the two meetings themselves lasted in excess of seven

21   hours.

22             Do I anticipate a motion to be filed on Mr. Ferrer

23   Sanchez in the future?  Quite candidly, I don't think so; I

24   hope so.  But I want the court to know that Mr. Ferrer Sanchez

25   has gone above and beyond the standard acceptance of

1    responsibility.

2           What I would request in this court -- the bottom of

3    the guidelines right now is 108 months.  I would ask the court

4    impose a sentence of 90 months.

5           When I said "slight variance," as defense counsel we

6    could reach for the stars and moon and make any suggestion we

7    want to the court, but I think in Mr. Ferrer Sanchez's

8    interest, in the interest of all his family members that are

9    here, his wife, brother, family friends, sister, I think a

10   sentence of 90 months in light of all the factors, the fact

11   that he is a Criminal History Category I, he has accepted

12   responsibility, that a sentence at 90 months would be the

13   appropriate sentence in this case.

14          THE COURT:  You know, Mr. Horowitz, one of the things

15   that Mr. Vazquez discusses, and which I haven't discussed based

16   upon my legal ruling on the computation of the guidelines, but

17   should I ignore that the focus of the factual proffer were the

18   two, sort of, célèbre tance as opposed to the number that we

19   cannot calculate that, basically, this is how your client

20   earned his living and that there may be -- and one of the other

21   things that Mr. Vazquez argued to the probation officer -- that

22   there may be individuals that we never know about because of

23   the methods used in this case which could have resulted in

24   their deaths?

25          MR. HOROWITZ:  Judge, as far as making a living from

1    it, it is not how Mr. Ferrer Sanchez made his living.  Was it

2    part and parcel of what he was doing in Mexico 10, 12 years

3    ago?  Yes.  But was it everything he was doing?  The answer is

4    no.

5            Is Mr. Ferrer Sanchez responsible for someone or

6    someones that may have perished?  Mr. Ferrer, as I told the

7    court, has met with the government on two occasions for lengthy

8    debriefings, and Mr. Ferrer Sanchez has been adamant that he

9    had absolutely, positively no involvement in any crimes of

10   violence and/or death.

11           So I don't think the court should take that into

12   account because Mr. Ferrer Sanchez has denied it.  He's denied

13   it.  If he made a false statement to the agents, I think,

14   knowing Mr. Vazquez as I do, he would have been the first one

15   to charge Mr. Sanchez with making a false statement to the

16   agents, which he has not done.  Mr. Ferrer Sanchez gave a

17   post-arrest interview to the agents where he denied committing

18   any crimes of violence.

19           These are allegations that the government has made

20   against him that have haunted Mr. Ferrer Sanchez not just a

21   year that he's been under indictment here but even before that

22   when he knew that these allegations, false allegations against

23   him have come up.

24           I do not think the court should take that into

25   account.

1        THE COURT:  Mr. Vazquez?  And then I will hear from

2   the defendant, if he wishes to speak.

3        MR. VAZQUEZ:  Your Honor, I just want to bifurcate my

4   comments.

5        To the extent that the court is willing to allow me at

6   a separate time or later or when it's convenient for court to

7   present the 3553(a) witnesses I would do so, and what I would

8   do is address this bulk of activity that is addressed in page 2

9   of our proffer that talks about what Mr. Ferrer Sanchez did,

10  and I will just make a brief proffer about it, and if the court

11  allows me, I will be happy to present the witnesses.

12       If we don't, the court I think would limit --

13       THE COURT:  You may proceed with the proffer.

14       MR. VAZQUEZ:  Your Honor, on Christmas Day of 2005

15  there was an event.  I won't get into why it happened, but

16  there was an event that triggered Mr. Ferrer Sanchez to flee

17  the United States when he was pending prosecution by a local

18  authority for attempted murder.

19       Mr. Sanchez denies that he did anything wrong, but he

20  fled the country and moved to Mexico.  And what he established

21  there and what's referenced in Mr. Horowitz's own filings was a

22  smuggling conspiracy that moved human beings.  We aren't

23  getting into the number of them, but it was his profession to

24  move human beings.  In his post-Miranda statements he says

25  smuggling is my thing.

1          Under Mr. Horowitz's filings, and we agree with this,

2     these smuggling groups operated under Los Zetas drug cartel and

3     oversaw the movement of human beings en masse.   Through

4     Mr. Sanchez's own admissions in the factual proffer he

5     acknowledges that he would call family members in South Florida

6     to get payments.

7          Our witnesses would testify that he did so in an

8     extortionate manner, and he did that to get people to release

9     their loved ones and the fear that that caused.

10          Our witnesses would testify that to operate this

11     enterprise it's very expensive.   So he had to steal a lot of

12     boats through South Florida through associates and engines that

13     would make their way down to Mexico.   This was a transnational

14     conspiracy that he was running.   He did that, and then he had

15     problems with the Zetas.

16          Our witnesses would testify that he hired a team that

17     your Honor has sentenced through *United States v. Lata, et al*

18     of criminals who traveled, and our records show, traveled to

19     Cancun, Mexico overlapping with the capture, shooting, and

20     suspected murder in a no body homicide of the bill collector

21     for the Los Zetas drug cartel.

22          Those individuals are here to testify.   The mother of

23     that person is here to testify, to the extent that she's

24     permitted.   This is what this defendant did so he could bank

25     money in Mexico and run it all through different businesses.

1    This is vast, this is extensive, this is very significant.

2          In addition to that, witnesses that are here to

3    testify will tell you, at least one of them that was kidnapped

4    by this team, and our witnesses would tell you that this was

5    part of a financing scheme.

6          How do you get money for multiple vessels, sailors,

7    captains, people to watch your human cargo, who were referred

8    to by numerous people as *pellitos*, which is Spanish for little

9    chickens.  They treated people in a subhuman condition, and did

10   that for profit so that he could generate money that was run

11   through the United States.

12         This is vast and this is extensive.  This is not

13   normal money laundering, and it's not normal money laundering

14   in furtherance of alien smuggling.

15         Based on that we abide by our request for an upward

16   variance because based on the court's rulings previously we

17   asked for 240 months.  I understand that the court has

18   disagreed with us.  We were trying to attribute the homicide

19   which changed the guidelines.

20         We believe a top or upward variance should be imposed

21   because, your Honor, this is an activity that has gripped South

22   Florida and other parts of the Caribbean, of our region for a

23   long period of time.  It is very complex organized crime, what

24   they have been doing.

25         We have news articles that are written by people

1    besieged by these groups, and it has taken a long time to

2    impact them.  They are intelligent.  They know how to run

3    money.  This is not a normal system where somebody just steals

4    a boat and randomly moves people.  This is a committed

5    practice.  This is a vocation of crime.

6        And based on that we believe that your Honor should

7    sentence this defendant not only to stop him, not only to deter

8    this conduct by this defendant, but to deter it from others, to

9    say smuggling human beings, especially when human beings are at

10   risk, this is a big deal.  Profiting off the misery of others

11   so that you can make $10,000 per head, that's a big deal, and

12   we should affirmatively deter that.

13       These cases should be taken, and we will continue to

14   present them respectfully to the court to tamp down this

15   activity and tamp down the network of individuals, the check

16   cashers, the boat thieves that make this possible, that make

17   this commercial suffering a reality.

18       Thank you, your Honor.

19       MR. HOROWITZ:  May I respond?

20       THE COURT:  Briefly, and then I want to hear from your

21   client, if he chooses to speak.

22       MR. HOROWITZ:  Yes, your Honor.  Your Honor, we are

23   here on a conspiracy to commit money laundering case.  What the

24   government is seeking to do is throw the kitchen sink at my

25   client for things he did and things he didn't do.

```
 1              Your Honor, when we crafted the factual proffer in
 2    this case, it was done extremely carefully.  The government
 3    made allegations that my client was working for the Zetas.  Not
 4    true.  And the Zetas, for the court's edification, is a gang
 5    that operates in Mexico.
 6              My client is not a gang member or working for any
 7    gang.  He is not responsible for any murders or homicides and
 8    whatever language the government wants to point Mr. Ferrer
 9    Sanchez to.
10              Your Honor, they have their cooperating witnesses,
11    every single one of them with a plea agreement, some of them
12    that have testified, some of them that have testified even
13    incredibly and lied before a jury.  That's what they want to do
14    to Mr. Ferrer Sanchez.
15              Mr. Ferrer Sanchez appears before this court contrite
16    and accepting responsibility for what he did, not for the
17    government's ills, not for what the government seeks to
18    attribute every other alien smuggler in the last 20 years they
19    try to attribute to Mr. Ferrer Sanchez, which is totally
20    improper and incorrect.
21              Mr. Ferrer Sanchez should be responsible for what he
22    did, and what he did he admitted to this court and should be
23    sentenced within the guideline range as a Criminal History
24    Category I or slightly below, as I have requested.
25              Your Honor, the one thing I did request is before
```

1    Mr. Ferrer Sanchez has an opportunity to speak to the court

2    that I have an opportunity to speak to him with the assistance

3    of the interpreters.

4         MR. VAZQUEZ:  Your Honor, may I say something really

5    quickly?

6         THE COURT:  Let Mr. Horowitz speak to his client for

7    just a moment counsel.

8         (Counsel conferring with defendant)

9         THE COURT:  Mr. Horowitz.

10        MR. HOROWITZ:  Thank you, Judge.  I appreciate the

11   extended timed that the court gave.  I know Mr. Ferrer Sanchez

12   wants to address the court, but I know Mr. Vazquez wants to

13   address something first.

14        MR. VAZQUEZ:  Your Honor, I just noticed something

15   that Mr. Horowitz said, and if I wasn't precise with my words,

16   I want to correct it.

17        Our allegation is not that Mr. Sanchez and the other

18   smuggling chiefs worked for the Zetas.  Our understanding is

19   that they were subordinate to them and had to pay a tax

20   themselves on penalty of death and retaliation.

21        So they were part of this ecosystem of movement of

22   migrants that was very dangerous, but we do not allege that he

23   was a Zetas member.  He had his own group, people that were

24   facilitated through boat thefts and whatnot, and banking, but

25   not that he was a Zetas.

```
1            If I misspoke, I apologize, but I wanted to correct
2   that for the court's understanding of Mr. Sanchez.
3            THE COURT:  Thank you.
4            Mr. Horowitz, does your client wish to address the
5   court?
6            MR. HOROWITZ:  Yes, he does, your Honor.
7            THE COURT:  Sir, would you stand, please?
8            THE DEFENDANT:  Good day, your Honor.  Thank you for
9   giving me the opportunity to be heard.
10           I accept full responsibility for the offense to which
11  I pled guilty.  I am very sorry and ask your forgiveness.
12           What I cannot accept and will never accept are
13  fabricated accusations --
14           THE INTERPRETER:  This is the interpreter.  I am going
15  to ask him to please repeat.
16           THE DEFENDANT:  -- where I had some involvement at
17  some point in my life where with I am being -- for which I am
18  being investigated, but I do -- would like -- I would like to
19  mention events, if you will give me the opportunity.
20           THE COURT:  Please, sir, continue.
21           THE DEFENDANT:  At the beginning of 2010 I approached
22  the government.  I asked a friend to enter a government
23  building.  I met with two agents and an incredible DEA agent
24  from Broward named Mr. Wilson, Vincent Wilson, an incredible
25  human being.
```

1    We went up to a hotel in Belize, in the country of

2    Belize, and under closed doors I entered into a contract for a

3    year and a half with the government giving them information.

4    He knew that my priority was being with my family and that I

5    could have been investigated.

6    After a year and a half of investigations, on

7    June 29th, under his knowledge, we carried out certain

8    operations.  On June 29th we did some organizations at his

9    instructions, and I had all types of help from the government.

10   And approximately on the 2nd or the 3rd, having just entered

11   Biscayne Bay, agents that were from FBI, CBP, and the DEA were

12   awaiting us.

13   My first interview was with agents, with FBI agents

14   and supervisors, and they asked me, well, how did you finance

15   everything?  And I explained to them that I had a jet ski

16   dealership.  And they told me that they just wanted to know if

17   some government agent had forced me to do this operation, and I

18   said no, that I had wanted to cooperate with the government.

19   And then after all of these interviews with the FBI

20   and the CBP I was exonerated on July 4th, 2011.  I have had two

21   interviews with the prosecutor, with agents, and attorneys.

22   The prosecutor mentioned that he was Cuban and that he wasn't

23   interested in human smuggling.

24   THE INTERPRETER:  This is the interpreter.  I am going

25   to ask him to repeat it.

1          THE DEFENDANT:  And the prosecutor has told me that he

2     needs people that have hurt other people and carried out

3     violent crimes, where I have told him that I truly don't know.

4          I made clarifications and cooperated in my case as

5     best I could, and my attorney has told me that he's very

6     pleased with me.

7          And then a few days later I received a letter stating

8     that the attorney is asking more time for me than for Nelson

9     Mandela.

10          In 2014, ICE agent Eric Moreno, a friend of one of the

11     agents that was on my case, the guy from ICE, he gave me an

12     appointment.  So he asked me to help him in a case with Cubans,

13     and I told him that I had been working for three years and had

14     no information regarding the case that he was talking about.

15          He proposed and said if you want to work for the

16     government.  I said yes, but this time you take me straight to

17     Washington and give me a CI contract for a year.  And since we

18     couldn't get to an agreement, I decided not to go ahead with

19     the deal because I was placing my family at risk and not

20     getting anything.

21          I only ask God to guide you today, especially due to

22     all this confusion, and that you truly judge me for my offense.

23     I know that I have failed and that I am not perfect.  I would

24     like to raise my daughter, and I want to ask your forgiveness

25     honorably.  And I also want to ask -- apologize to my friends

1   and family and ask that they forgive me.  And I want to

2   apologize to the United States, especially to the prosecutor in

3   charge, and I want to apologize to my attorney because so many

4   times I have said to him you are a friend of the prosecutors.

5   I want to apologize to the incredible agents that have made me

6   laugh and cry so much.  May God bless everyone in this

7   courtroom, and thank you very much.

8          THE COURT:  Thank you, sir.  I'd ask counsel and the

9   defendant to please stand.

10          After a review of the record in this case and the

11   presentence report I find that the guideline range as computed

12   in the PSR adequately reflects the factors contained in 3553,

13   and I will be sentencing this defendant within the advisory

14   guideline range.

15          It is the judgment of the court that the defendant is

16   hereby committed to the Bureau of Prisons for a term of 108

17   months as to Count 3.

18          Upon release from imprisonment the defendant is placed

19   on supervised release for three years.  He is to abide by the

20   standard conditions of supervised release and any special

21   conditions as noted in Part F of the presentence report.

22          Since the defendant is not a United States citizen, I

23   will advise that the three years may be a non-reporting

24   supervision.

25          If, for some reason, he remains in the United States,

```
 1   he is to abide by those standard conditions as I have just

 2   mentioned.

 3        He is to pay the special assessment of $100 and

 4   forfeit right, title, and interest in property consistent with

 5   the plea agreement.  If one has not been submitted, the United

 6   States shall submit a proposed order within three days.

 7        Now that sentence has been imposed does the defendant

 8   or his counsel object to the court's finding of fact or the

 9   manner in which the sentence was pronounced?

10        MR. HOROWITZ:  Your Honor, I just want to renew my

11   objections to the sophisticated laundering aspect of the

12   sentencing guidelines, the four-level increase for role, and

13   failure of court to give a variance to Mr. Ferrer Sanchez.

14        THE COURT:  Does your client have anything further,

15   Mr. Horowitz?

16        MR. HOROWITZ:  No, your Honor.

17        THE COURT:  Mr. Vazquez, are you objecting to the

18   court's guideline calculation in this case?

19        MR. VAZQUEZ:  Just preserving the objections that I

20   made before.

21        If I may interject, at this time forfeiture counsel

22   would like to step in.

23        THE COURT:  Yes.

24        MS. MIRANDA:  Your Honor, if I may, I just want to

25   clarify for the record so that we pronounce forfeiture
```

1    correctly as part of Mr. Ferrer Sanchez's sentence.

2         The government has filed a motion for a preliminary

3    order forfeiture at Docket Entry 54.  Your Honor, it was filed

4    today so it was, perhaps -- I am not sure if you have had the

5    opportunity to review it.

6         The government is seeking a $5.4 million forfeiture

7    money judgment consistent with the loss amount set forth in the

8    PSI.  In addition, the government seeks two pieces of real

9    property as directly forfeitable assets.

10        I have spoken with defense counsel prior to this

11   sentencing, and defense counsel has indicated to me there is no

12   objection to the forfeiture money judgment of 5.4 million.

13        In addition, there is no objection to the

14   forfeitability of the properties as to the defendant which

15   would become final at sentencing and the entry of the

16   preliminary order; however, there is a concern over third

17   parties who may have claims against the properties.  Those,

18   your Honor, I would submit, would be dealt with at the

19   ancillary proceeding stage and do not need to be addressed

20   today.

21        THE COURT:  Mr. Horowitz, is that your representation

22   to counsel for the United States?

23        MR. HOROWITZ:  As far as the money judgment is

24   concerned, your Honor, counsel is absolutely correct.  But I

25   want Mr. Ferrer Sanchez to understand that the forfeiture is

```
 1    only as to his personal interest in the property.
 2              THE COURT:  Thank you very much.
 3              Thank you, counsel.
 4              MR. VAZQUEZ:  Your Honor, I have two witnesses or
 5    claimants to restitution.  I can present them at another time.
 6    They are available.  One is an inmate, and one is --
 7              THE COURT:  Why don't we set that for another time.
 8              THE DEPUTY CLERK:  How soon?
 9              MR. VAZQUEZ:  60 days.
10              THE COURT:  A regular restitution date?
11              MR. VAZQUEZ:  Yes.
12              THE COURT:  So 60 days.
13              THE DEPUTY CLERK:  March 25th, 10:00 a.m.
14              MR. HOROWITZ:  March 25th is acceptable to the
15    defense, your Honor.
16              THE COURT:  Anything further?  We will send out -- we
17    will docket that and send out a notice.
18              MR. VAZQUEZ:  May I check if the agent is available?
19              MR. HOROWITZ:  I have one brief recommendation, that
20    the court recommend that Mr. Ferrer Sanchez serve his sentence
21    as close to Miami, Florida as possible.  I have advised
22    Mr. Ferrer Sanchez that is a court recommendation, not a court
23    order, and it's based upon a security level and space
24    availability at the institutions.
25              THE COURT:  I will make that recommendation, but the
```

1   defendant should understand I have no control over where he is

2   housed.  That's totally up to the Bureau of Prisons.

3          Sir, you have a right to appeal the sentence imposed.

4   Any notice must be filed within 14 days.  If you are unable to

5   pay the cost of an appeal, you may apply for leave to appeal in

6   forma pauperis.

7          Thank you very much.

8          (Proceedings adjourned to March 25, 2020, at

9   10:00 a.m.)

10

11                  C E R T I F I C A T E

12

13      I hereby certify that the foregoing is an accurate

14   transcription of the proceedings in the above-entitled matter.

15

16   April 8, 2020            /s/ Jill M. Wells
                              Jill M. Wells, RPR, CRR, CSR
17                            Official Court Reporter
                              400 N. Miami Avenue
18                            Miami, Florida 33128
                              jill_wells@flsd.uscourts.gov
19

20

21

22

23

24

25